**Robert S. STEWART, Appellant– Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 53A01–0508–CR–391.

Court of Appeals of Indiana.

Jan. 18, 2006.

Transfer Denied March 16, 2006.

---

David A. Collins, Monroe County Public Defender's Office, Bloomington, for Appellant.

Steve Carter, Attorney General of Indiana, Richard C. Webster, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Robert Stewart appeals the sentence he received after pleading guilty to murder and attempted murder. We affirm.

### Issue

Stewart presents two [1] issues for our review, one of which is dispositive: whether the trial court properly sentenced him.

### Facts and Procedural History

According to the factual basis, on June 13, 2002, Stewart finished work around 3:00 p.m. and accepted a ride home from his co-worker, Stacy Arnold. During the drive, Stewart drank several beers. After being dropped off at his Monroe County home, Stewart drove to Bloomington, where he purchased $150 worth of crack cocaine. Stewart smoked the "eight ball" and then drove to his brother's nearby residence. Tr. at 13–14. When Stewart arrived around 6:00 p.m. neither his brother nor his brother's wife was home. However, L.S., their fourteen-year-old daughter, was home watching her two-year-old brother, S.S. L.S. permitted Stewart, her uncle, entrance to the home. Stewart be-

---

**1.** Stewart first argued that his plea was an "open plea" and that therefore he could challenge his sentence. Appellant's Br. at 5–6. Citing *Gutermuth v. State,* 817 N.E.2d 233, 234–35 (Ind.2004) and *Brewer v. State,* 830 N.E.2d 115, 118 (Ind.Ct.App.2005), *trans. denied,* the State concedes that Stewart's plea was an open one. Appellee's Br. at 5. Accordingly, we proceed to the issue of the propriety of the sentence.

came angry,[2] picked up a knife, and "stabbed or slashed at" L.S. *Id.* at 16. Seeing that he had cut L.S., Stewart panicked and stated, "I got to get you to the hospital." *Id.* L.S. then got in Stewart's truck; Stewart carried S.S. into the truck.

At some point during the drive, Stewart "decided to get rid of the children." *Id.* at 23, 86. Hence, twenty to thirty minutes after leaving his brother's home, Stewart stopped his truck on Moon Road on a large bridge high above Bean Blossom Creek. *Id.* at 17–18, 20–21. He then pushed L.S. off the bridge, took S.S. out of the truck, and dropped him over the bridge as well. *Id.* at 17–18. Stewart had the ability to form his own judgments and thoughts at the time of crimes. *Id.* at 27. Despite the cocaine and residual alcohol in his system, Stewart knew what he was doing and intended the actions at the time he performed them. *Id.* Further, Stewart understood that "under the circumstances given the height from the bridge to the water" that the impact could have caused someone's death and that the depth of the water was sufficient to drown someone. *Id.*

Thereafter, Stewart drove back to his residence and removed his truck's license plate. *Id.* at 76. When Stewart's brother stopped by, Stewart revealed nothing about what had happened with the chil-

dren. *Id.* at 74. Stewart then called a friend, and they ate at a restaurant, went to the friend's home, and smoked marijuana. *Id.* at 74–75. In the meantime, a passerby found L.S., and she was taken to a hospital for treatment. *Id.* at 81.

Upon his return home, Stewart found police waiting to arrest him. In a videotaped statement,[3] Stewart admitted slashing L.S.'s throat and throwing both children in the creek. S.S.'s body was found in Bean Blossom Creek. Autopsy results revealed that he had drowned.

On June 17, 2002, the State charged Stewart with murder and attempted murder. Appellant's App. at 13. At a January 3, 2003 hearing, Stewart pled guilty to both counts, and the State agreed in writing not to request the death penalty or a sentence of life without parole. *Id.* at 15. On January 24, 2003, the court held a sentencing hearing and ordered that Stewart serve 100 years in prison. In deciding upon that term, the court enhanced Stewart's murder sentence to sixty years, enhanced his attempted murder sentence to forty years, and ordered the two terms served consecutively.[4] The relevant portions of the sentencing order follow.

A Pre–Sentence Investigation report[5] was filed on January 22, 2003 and reviewed by the Court. The parties filed

---

2. The reason for his anger is unclear. Drugs, frustration, and the fact that his brother and his brother's wife owed him money were all suggested as possible reasons for his anger. Tr. at 16, 78–79.

3. None of the videotapes have been included on appeal. However, at the bottom of the first page of the "State's and Defendant's Exhibits (All Stipulated)" volume, there is a notation that videotapes "will be provided to Court of Appeals upon request."

4. At the time of sentencing, the presumptive term for murder was fifty-five years, with the possibility of ten years added or subtracted

depending upon aggravating and mitigating circumstances. *See* Ind.Code § 35–50–2–3(a). The presumptive sentence for a class A felony was thirty years, with the possibility of twenty years being added for aggravating circumstances and ten years being subtracted for mitigating circumstances. *See* Ind.Code § 35–50–2–4. Our legislature has since amended the Indiana sentencing statutes to provide for "advisory" rather than "presumptive" sentences. *See* 2005 Ind. Acts 71.

5. Stewart has not included the pre-sentence investigation report with the other materials submitted on appeal.

a Stipulation on January 22, 2003. Pursuant to that, the Court reviewed [Stewart's] statements to the police captured on three videotapes, police reports, the autopsy report concerning [S.S.] and the medical records of [L.S.]. The court now accepts the Plea and Sentencing Agreement. Evidence and argument is heard and considered.

There are no mitigating circumstances. There are substantial aggravating circumstances making appropriate enhanced sentences and consecutive sentencing. They are set forth in the paragraphs following.

On June 13, 2002 [S.S.] was a healthy two year old, three feet tall and weighing 35 pounds. His mother was away from the home and he was being cared for by his half-sister, [L.S.]. [L.S.'s] father is the brother of [S.S.'s] father. Both fathers are the half-brothers of [Stewart]. The "house rule" for [L.S.] was that she was to refuse entry to guests when her mother was out. Because she trusted him and because he was her "favorite uncle", [L.S.] allowed [Stewart] into the home. *He violated her trust and this violation is an aggravating circumstance.*

After entering the home, [Stewart] chatted amiably with [L.S.]. When she thought he was leaving [L.S.] hugged him. As she did so he cut her neck under her chin and then immediately pushed her to the floor in the kitchen and cut her again piercing her larynx. One cut was 2–3 inches long and the other 6 inches long. Thirteen-year-old [L.S.] sustained lacerations to her hands; apparently she attempted to protect herself or stop her uncle. [Stewart] is a large man with strength acquired through jobs of physical labor. [L.S.] had no fair opportunity to thwart him. Because she believed her uncle was going to take her to the hospital, [L.S.] got

into his truck. [Stewart] acknowledged that his original intention was to seek treatment for [L.S.'s] wounds at the hospital but changed his mind on the way. [Stewart] thought he had to "get away from" the children. [Stewart] proceeded to a remote bridge over a creek. After stopping his truck there he told [L.S.] he wanted to "play a game" and she should get out of the truck. She refused. He pulled [L.S.] from the truck and told her that her own father wanted her dead and that her little brother would be next. He pushed [her] over the bridge and into the creek, a drop of some 30 feet. He pulled the screaming child from the truck and threw him off the bridge. [Stewart] heard the child hit the water. He drove away. The trickery engaged in by [Stewart] with [L.S.] and *the differences in age and physical size and strength are aggravating circumstances here.* Obviously *the difference in age between [S.S.] and his uncle is an aggravating circumstance as well.*

[Stewart] proceeded home. He burned certain items from the truck and wiped its door down. He called the co-worker who had driven him home from work that day to tell him to say that they had returned home later than they actually had. [Stewart] went to dinner with a friend and was arrested upon his return home a short while thereafter. *His calculated behavior designed to cover up the crime and thwart discovery of the facts is an aggravating circumstance.* This is particularly so because Stephen was not found until the next morning. *[Stewart's] actions and failure to tell the police the true story upon his arrest evidence a callous and calculated disregard for others.* One is left to wonder if [S.S.] would have survived had [Stewart] gone back to the creek to at-

tempt a rescue or notified the authorities of what he actually did to [S.S.]. Apparently [S.S.] received no life-threatening injuries to his body that would have led to death. He drowned in two feet of water because no one except [Stewart] had an opportunity to save him.

Throughout the course of these proceedings and when questioned by the police [Stewart] has continued to minimize his responsibility for these unfathomable acts. He seems to remember only those things that would bolster his position that this was all about drugs and not about him. He has no regret which seems children-centered rather than self-interested. [Stewart] lied to the police in his videotaped statements and this was so when they were desperately seeking [S.S.] or his body. He referred to the children as "crack babies". Upon learning that [S.S.] has been found dead in the creek the next day, [Stewart] simply says "He is?" *His attitude and lack of remorse are aggravating circumstances.*

[Stewart] may very well have substantial substance abuse issues, but the system bears no responsibility for this. As a result of earlier convictions [Stewart] has had available to him treatment and counseling. Though he has gone through the programs and completed certain of them, he continued to use illegal substances both during and after his treatment. [Stewart] has demonstrated that treatment and interventions provided through probation are ineffective for him and that his substance use contributes to his danger.

[Stewart] has prior convictions for the following: Resisting Law Enforcement (2); Dealing in Marijuana; Check Deception; Operating a Vehicle with a .15% BAC; Possession of a Controlled Substance; Possession of Marijuana (2); Operating While Intoxicated; and Driving While Suspended. All except one are misdemeanors. *This history of criminal activity is an aggravating circumstance.*

[Stewart] should receive enhanced sentences as a result of all of the factors listed above and as a result of the *particular nature and circumstances of the case as set out herein.*

*Id.* at 17–19 (emphases added).

On June 13, 2005, the trial court granted a motion for permission to file a belated appeal.

## Discussion and Decision

Citing *Fosha v. State,* 747 N.E.2d 549 (Ind.2001), Stewart contends that the *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) rule, as set out in *Smylie v. State,* 823 N.E.2d 679 (Ind.2005), *cert. denied,* applies to his case. Appellant's Br. at 7. According to Stewart, "[t]hat means, except for [Stewart's] prior criminal history, the sentencing court erred by denying his right to a jury for the purpose of finding aggravating circumstances." *Id.* at 7–8. In challenging "any" enhancement of his sentences, Stewart asserts that his convictions "which are mostly alcohol or drug related do not relate in gravity or nature to Murder or Attempted Murder[.]" *Id.* at 8.[6]

In *Trusley v. State,* 829 N.E.2d 923 (Ind. 2005), our supreme court elaborated on *Blakely.*

---

6. Given that two victims were involved, Stewart wisely does not challenge the court's decision to order consecutive sentences. *See Estes v. State,* 827 N.E.2d 27, 29 (Ind.2005) (noting that the existence of multiple victims justifies imposition of consecutive sentences and that "a court's authority to order consecutive sentences was not affected by *Blakely.*").

*Blakely* is not concerned, primarily, with what facts a judge uses to enhance a sentence, but with how those facts are found. Under *Blakely*, a trial court in a determinate sentencing system such as Indiana's may enhance a sentence based only on those facts that are established in one of several ways: 1) as a fact of prior conviction; 2) by a jury beyond a reasonable doubt; 3) when admitted by a defendant; and 4) *in the course of a guilty plea where the defendant has waived* Apprendi *rights and stipulated to certain facts or consented to judicial factfinding. See Blakely*, 542 U.S. at 309, 124 S.Ct. at 2537, 2541; *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 756, 160 L.Ed.2d 621 (2005).

Id. at 95 (emphasis added); *see also Johnson v. State*, 830 N.E.2d 895, 897 (Ind. 2005); *cf. Sowders v. State*, 829 N.E.2d 18, 19 (Ind.2005) (concluding that enhanced sentences were improper because they "were based on various aggravating factors that were neither prior convictions, nor reflected in the jury's verdict, nor admitted by Sowders. Also, Sowders did not stipulate to the relevant facts or consent to judicial factfinding when she pled guilty.").

■ Like Sowders, Stewart pled guilty. However, unlike in *Sowders*, the State and Stewart "stipulate[d] and agree[d] that the Court has been provided, for in camera review prior to sentencing . . . Video tapes (3) of [Stewart's] statement to police, police reports, autopsy report, [and] medical records of Lisa[.]" *Id.* at 16. Also in that same written stipulation, which was filed January 22, 2003, the State and Stewart further agreed that the court "may use any information from these sources in determining a sentence. Any or all of these items may be submitted into the record at sentencing at the request of either party." *Id.* Pursuant to the parties' explicit stipula-

tion, the court did indeed utilize the information submitted and found the following aggravating circumstances: Stewart's violation of L.S.'s trust, the difference in age and physical size between Stewart and the children, his calculated behavior designed to cover up the crime, Stewart's failure to tell the truth to police upon his arrest, and his lack of remorse. In light of the clear stipulation, we disagree with Stewart's contention that the "sentencing court erred by denying his right to a jury for the purpose of finding aggravating circumstances." Appellant's Br. at 7–8. Under these particular circumstances, Stewart's *Blakely* rights were not violated.

■ Even absent the aggravating factors noted above, the enhancement was proper in light of Stewart's criminal history alone. We do not reach this conclusion lightly.

We Indiana judges often recite that "a single aggravator is sufficient to support an enhanced sentence." While there are many instances in which a single aggravator is enough, this does not mean that sentencing judges or appellate judges need do no thinking about what weight to give a history of prior convictions. The significance of a criminal history "varies based on the gravity, nature and number of prior offenses as they relate to the current offense." *Wooley v. State*, 716 N.E.2d 919, 929 n. 4 (Ind. 1999). We observed in *Wooley* that "a criminal history comprised of a prior conviction for operating a vehicle while intoxicated may rise to the level of a significant aggravator at a sentencing hearing for a subsequent alcohol-related offense. However, this criminal history does not command the same significance at a sentencing hearing for murder." *Id.* A different example might help illustrate the same point. A conviction for theft six years in the past would proba-

bly not, standing by itself, warrant maxing out a defendant's sentence for class B burglary. But, a former conviction for burglary might make the maximum sentence for a later theft appropriate. *See also Hollen v. State,* 761 N.E.2d 398 (Ind.2002).

Certainly not all cases will produce as clear-cut a separation between significant and nonsignificant prior convictions as these examples. The need for clarity and careful weighing, made by reference to appropriate prior criminal convictions, is more pronounced than ever given the increased importance prior criminal convictions play in the sentencing process in a post-*Blakely* world.

*Morgan v. State,* 829 N.E.2d 12, 15–16 (Ind.2005).

Here, Stewart's criminal history is not inconsequential. His prior convictions consist of resisting law enforcement, dealing in marijuana, check deception, operating a vehicle with a .15% BAC, possession of a controlled substance, possession of marijuana, operating while intoxicated, and driving while suspended. While the majority of Stewart's prior convictions were misdemeanors, at least one conviction was for a potentially violent offense. Moreover, despite receiving treatment and counseling in conjunction with his prior convictions, Stewart has continued to use illegal substances and to violate the law. Given the nature and the number of Stewart's prior offenses, his prior criminal history was sufficient to support an enhanced, though not maximum, sentence.

Affirmed.

FRIEDLANDER, J., and MAY, J., concur.